UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

SUSAN MONICA,                                          Case No. 3:23-cv-01241-AA

        Petitioner,                                **OPINION AND ORDER**

    v.

NICHOLE BROWN,

        Respondent.

_____

AIKEN, District Judge.

Petitioner filed this habeas action under 28 U.S.C. § 2254 challenging her state court convictions for Murder, Abuse of a Corpse, and Identity Theft. Petitioner primarily claims that the trial court's denial of substitute counsel and counsel's ineffective assistance violated her rights under the Sixth Amendment. The Oregon courts rejected these claims in decisions that are entitled to deference, and Petitioner's remaining claims are procedurally defaulted and barred from federal review. Accordingly, the Petition is DENIED.

- 1 -    **OPINION AND ORDER**

## BACKGROUND

As recounted by the Oregon Court of Appeals, "Petitioner murdered two men and left their bodies in her pigpen to be eaten by her pigs." *Monica v. Myers*, 319 Or. App. 376, 378, *rev. denied*, 370 Or. 212 (2022).

> In January 2014, the son of a man named Haney reported him missing in Jackson County. Haney had been residing on petitioner's property, and so his son visited petitioner to find his father's belongings. He found most of his father's belongings intact—including vehicles and other items—but could not find his wallet. Law enforcement visited the property to see Haney's camper, and as they were leaving the camper, they noticed large pigs in a pen. Petitioner spontaneously told law enforcement that she was "in the process of trying to get a government grant for research with the pigs on how they consume human bodies." Law enforcement returned to the property a few days later and…asked if they could look around the property, which prompted petitioner to joke about the officers needing a warrant. She then spontaneously stated, "I've threat - threatened to kill everybody and feed them to my pigs. But, um, the thing is pigs - pigs would probably eat you, but it's not going to be good for them." Petitioner again mentioned her interest in obtaining a grant to research pigs eating humans but then clarified that she was joking.

> Law enforcement investigated Haney's food benefit card usage and found evidence suggesting that petitioner had been using the card. As a result, they obtained a warrant to search the property for evidence regarding identity theft.…When executing the warrant, officers spoke with petitioner, who admitted to using the benefit card. Petitioner claimed that Haney had given her the card previously to buy food and beer for him. Officers walked around the property with a video camera. Shortly after beginning the recording,…the officer encountered a human leg. Officers arrested petitioner and applied for a new search warrant—this time for evidence of murder.

> At the police station, petitioner told officers that she had found Haney "half eaten" by the pigs in her pigpen, with his "guts***all over the place," but he was alive. She claimed that she had retrieved a rifle from her home and shot him in the head to end his suffering. She stated that he was moaning and moving his arm before she shot him. She claimed that she left him in the pen and went to feed other animals after shooting him. She explained that the reason she did not call police was her fear that the police would shoot her pigs. She returned to the pen a few days later, noting that the pigs do not eat clothes, and picked up his clothes and his remains to put in her burn barrel.

> Petitioner also told officers about another body on her property, that of a man named Delicino. She told officers that Delicino was an alcoholic and described a

confrontation with Delicino about a missing gun, resulting in a "tussle" over her .22 pistol. She claimed that during the melee he said that he did not want to return to prison and shot himself several times in the head. She left his body in the pigpen "until there was practically nothing left."

Law enforcement, while executing the second search warrant, found the remains of both Haney and Delicino in or around the locations that petitioner had described in her interview. Officers spoke with petitioner again, now having information about the bodies, and petitioner changed her story about Delicino, stating that she shot him, but in self-defense. Petitioner was charged with two counts of murder, two counts of abuse of a corpse in the first degree, and one count of identity theft.

*Id.* at 378-80; *see also* Resp't 102 (indictment). Petitioner pled not guilty to all charges, and she was ordered detained pending trial. Christine Herbert and Zachary Light were initially appointed to represent Petitioner, and in January 2015, Garren Pedemonte replaced Light. Resp't Ex. 103 at 6, Resp't Ex. 112 at 39.

Shortly before trial, Petitioner requested that she be permitted to "participate as essentially the lead attorney." Transcript of Proceedings (Tr.) 89, 91 (ECF No. 19-1).[1] After discussion with the court, Petitioner decided on "hybrid" representation, where she would conduct cross-examination of the lead detective and perhaps another law enforcement officer. Tr. 139. The trial court agreed to Petitioner's requested arrangement, and on April 13, 2015, the case proceeded to trial.

During its case in chief, the state presented Petitioner's recorded statements to law enforcement officials admitting that she shot Delicino and Haney and recounting several different justifications for doing so. Tr. 281-338, 341-405, 412-447, 450-539, 540-48, 567-779, 791-25, 922-966. The state also presented audio recordings of telephone calls Petitioner made from the county jail, during which Petitioner again admitted killing Delicino and Haney. Tr.

---

[1] Transcript citations refer to the page number in the bottom right hand corner, e.g., "TRANSCRIPT, Page 89 of 1296."

1101-1110. Among other witnesses, the state called a medical examiner, who testified that Delicino and Haney suffered bullet wounds consistent with .22 caliber bullets from a handgun or rifle. Tr. 1134, 1139-41.

Petitioner took the stand in her own defense. Petitioner testified that she and Delicino had an argument, and he "went nuts" and "attacked" her after she accused him of stealing a pistol and rifle. Tr. 1179, 1181. Petitioner was holding another rifle and pistol at the time, and she claimed that Delicino tried to take the rifle. Tr. 1182. Petitioner testified that, as they struggled for control of the rifle, she decided to shoot Delicino in the arm to "make him let go." Tr. 1182. Petitioner testified that after she shot Delicino, he initially fell to the floor but then stood up and threatened to kill her. Tr. 1182. Petitioner ran to another room and hid, and Delicino followed and "grabbed" her and the rifle again. Tr. 1182-83. Petitioner then "shot him again in the head" and fired three more rounds from her pistol. Tr. 1183. Petitioner testified that Delicino kept struggling, and she wrested the rifle away and struck him with it until he lay on the ground, grabbing her left leg. Tr. 1183-84. Petitioner testified that Delicino would not let go of her leg, and she shot him three more times with the rifle. Tr. 1184. Petitioner then retreated to her room for "a couple of hours," and when she returned, her pigs were licking Delicino's head. Tr. 1186-87. Petitioner testified that the pigs eventually "dragged him outside" and began eating Delicino, and she later buried his remains. Tr. 1188-89.

Petitioner also testified that Haney left her property in a white car and she next saw him lying in her pig pen, with her pigs eating his intestines. Tr. 1193-95. Because an expended shotgun shell was found in the pigpen, Petitioner posited that someone had attempted to "poach" one of her pigs and wounded Haney in the abdomen in the process. Tr. 1194, 1203. Petitioner testified that she saw Haney's arm move, heard him moan, and left to retrieve her rifle. Tr. 1195-

- 4 -    **OPINION AND ORDER**

96. When she returned, the pigs had turned Haney onto his stomach, and Petitioner shot Haney in the back of the head because "there was no way he was going to live more than a couple of minutes at most and I wanted to put him out of his misery." Tr. 1196-97.

The jury found Petitioner guilty on all counts. Tr. 1286-88. The trial court sentenced Petitioner to consecutive terms of life imprisonment with a minimum of twenty-five years on each murder count, and consecutive terms of thirty days in jail for each of the remaining three charges. Tr. 1294; Resp. Ex. 101.

Petitioner directly appealed her convictions and raised assignments of error arising from the trial court's denial of Petitioner's requests for substitute counsel and self-representation. Resp't Ex. 104. The Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. *State v. Monica*, 287 Or. App. 465, *rev. denied*, 362 Or. 300 (2017); Resp't Ex. 107-08.

Petitioner then sought post-conviction relief (PCR) and alleged that counsel rendered ineffective assistance by failing to seek suppression of evidence obtained from the search of her property, failing to impeach the testimony of a state witness, and failing to challenge the introduction of pawn receipts allegedly showing that Petitioner pawned two shotguns after being contacted by law enforcement. Resp't Ex. 112. The PCR court rejected Petitioner's claims and denied relief. Resp't Ex. 147. The Oregon Court of Appeals affirmed in a written opinion and the Oregon Supreme Court denied review. *Monica v. Myers*, 319 Or. App. 376, *rev. denied*, 370 Or. 212 (2022); Resp't Exs. 152-54. Petitioner now seeks federal habeas relief.

## DISCUSSION

Petitioner asserts four grounds for relief in her Second Amended Petition. Claim 1 alleges that the trial court violated Petitioner's Sixth Amendment rights by denying her requests for new

- 5 -    **OPINION AND ORDER**

counsel. Claim 2 includes two subparts, 2(a) and 2(b), and alleges that the trial court violated Petitioner's Sixth Amendment right to self-representation by failing to conduct a *Faretta* colloquy and by interfering with her cross-examination of witnesses. Claim 3 includes three subparts, 3(a), 3(b), and 3(c), and alleges that counsel rendered ineffective assistance of counsel by failing to impeach witness testimony, failing to investigate the pawn receipts for two shotguns, and failing to object to testimony commenting on Petitioner's credibility. Finally, Claim 4 alleges that Petitioner's Sixth Amendment right to counsel was violated because trial counsel had an undisclosed conflict of interest. *See* Sec. Am. Pet. at 17-27 (ECF No. 25).

In her supporting Brief, Petitioner presents no arguments to support Claims 2(a) and 3(c). Pet'r Brief at 1, 22, 25 n.4 (ECF No. 48). Accordingly, Petitioner fails to sustain her burden to prove that habeas relief is warranted on Claims 2(a) and 3(c). *See Mayes v. Premo*, 766 F.3d 949, 957 (9th Cir. 2014) (stating that habeas petitioner bears the burden of showing entitlement to habeas relief); *Davis v. Woodford*, 384 F.3d 628, 637-38 (9th Cir. 2004) (accord).

With respect to Petitioner's remaining claims, Respondent argues that Claims 1, 3(a), and 3(b) were rejected by the trial court and the Oregon Court of Appeals in decisions that are entitled to deference and that Claims 2(b) and 4 are barred from federal review through procedural default.

A.  Deference to State Court Decisions – Claims 1, 3(a), and 3(b)

Pursuant to 28 U.S.C. § 2254(d), this Court may not grant a petition for a writ of habeas corpus filed by a state prisoner with respect to any claim that was adjudicated on the merits in state court, unless the adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1) and (2).

A state court decision is "contrary to" clearly established federal law if it fails to apply the correct Supreme Court authority or reaches a different result in a case with facts "materially indistinguishable" from relevant Supreme Court precedent. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is an "unreasonable application" of clearly established federal law if the state court identifies the correct legal principle but applies it in an "objectively unreasonable" manner. *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam). To obtain federal habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Thus, "even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable." *Penry v. Johnson*, 532 U.S. 782, 793 (2001).

1. Claim 1

Petitioner alleges that the trial court violated Petitioner's Sixth Amendment right to counsel by denying her requests for new or substitute counsel. Petitioner argues that the trial court utilized an insufficient "process" by repeatedly interrupting her as she tried to vocalize her complaints and did not allow Petitioner the opportunity to fully explain her dissatisfaction. Petitioner further argues that counsel took an adverse position to her by asserting that Petitioner's complaints were invalid.

- 7 -    **OPINION AND ORDER**

"The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel at all critical stages of the proceeding." *Carter v. Davis*, 946 F.3d 489, 507 (9th Cir. 2019) (citing *Coleman v. Alabama*, 399 U.S. 1, 7 (1970)). However, that right "does not guarantee the defendant 'will inexorably be represented by the lawyer whom he prefers.'" *Id.* (quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988)); *see also United States v. Gonzalez-Lopez,* 548 U.S. 140, 146 (2006) (stating that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them"); *Hendricks v. Zenon,* 993 F.2d 664, 671 (9th Cir. 1993) (stating that a defendant "is not necessarily entitled to the appointed counsel of his choosing"). Likewise, the Sixth Amendment does not guarantee the right to a "meaningful relationship" between a defendant and counsel. *Morris v. Slappy,* 461 U.S. 1, 14 (1983).

Instead, the Sixth Amendment is violated when a defendant is forced "to go to trial with an attorney with whom he has an irreconcilable conflict." *Stenson v. Lambert,* 504 F.3d 873, 886 (9th Cir. 2007) (citation omitted). "An irreconcilable conflict in violation of the Sixth Amendment occurs only where there is a complete breakdown in communication between the attorney and client, and the breakdown prevents effective assistance of counsel." *Id.* "To determine whether a conflict rises to the level of 'irreconcilable,' a court looks to three factors: (1) the extent of the conflict; (2) the adequacy of the inquiry by the trial court; and (3) the timeliness of the motion for substitution of counsel." *Id.*

On May 22, 2014, Petitioner sent a note to the trial court requesting new counsel. Petitioner complained that counsel's investigator would not speak to her until she signed a release to obtain her mental health records, and Petitioner wanted someone to investigate where Haney was "for the 6+ weeks he was missing before he turned up in my pig pen." Resp't Ex. 104 at 41.

- 8 -    **OPINION AND ORDER**

On May 30, 2014, the court held a hearing on Petitioner's request. Petitioner confirmed that she wanted a new attorney and stated that "the reason for it is I have been trying to get [counsel] to let my investigator over here investigate things." Tr. 3. At the court's request, Herbert responded to Petitioner's complaint:

> I have employed [an investigator] on this case to assist and [the investigator] takes instruction from me on what to do on the case in aid of the defense. And I think Miss Monica has her own desire of what she would like [the investigator] to do. And you know, we hear that and we take into consideration what she wants to do, and we are, in fact, doing what it is that she wants to do. But I have to focus on the litigation piece and use my investigator to assist in the defense of the litigation and how that's structured and how and when I use the investigator is really litigation tactics. I explained that to Miss Monica. I think she's really frustrated with how long this is taking and I've tried to convey this is a murder case and it's going to take some time.
>
> ***
>
> So I don't know really, what the basis of her complaint is. But she's—in my opinion, she's in excellent hands. We have a good team here and I think Miss Monica needs to learn to be patient and listen to us and not try to drive what she believes is important, but instead, to just listen to her attorneys and let us do our job.

Tr. 4-5. The court asked Petitioner to clarify what she would like counsel to investigate, and Petitioner responded, "Primarily, a Richard Haney—Robert Haney left my property." Tr. 5. The court interjected and explained that "my concern is that potentially you might start talking about the case as far—and I guess I'm asking you about the case, but as far as the substance of the case is concerned itself, you probably don't want to talk too much about it." Tr. 5-6. Petitioner responded, "Well, [counsel] keeps telling me not to talk about it and I'm trying to tell what happened." Tr. 6.

The court advised Petitioner:

> You're going to be able to make whatever defense you want to make. You're going to be able to say whatever you want to say. You're going to be able to throw anything out there you want. You have that right in this country and in this

- 9 -   **OPINION AND ORDER**

courtroom you can say whatever you want. I'm asking—or I think what you should do is you need to listen to your attorneys for a little bit of time. If they think of something that needs to be done or something can't be done, they'll let you know.

Tr. 6. Petitioner further explained that the "crux" of her complaint was counsel's perceived lack of urgency in investigating her claims and her fear that evidence would be "lost." Tr. 7.

The trial court encouraged Petitioner to cooperate with her counsel and denied the request for substitute counsel, stating, "I'm going to keep the attorneys on this case. They're going to work with you. But I want you to work with them; I want you to work with the investigator. I will give you every opportunity to represent yourself down the line, but right now, I will not do that." Tr. 8. Petitioner then told the court that she had "talked to [the investigator] just the other day and she finally said that [counsel] is going to let her do something about this." Tr. 11. The court reassured Petitioner, that "I'm always willing to work with you and always willing to work and get this thing taken care of. And I think you work with the investigator, you work with the team, and we'll see what goes after that." Tr. 14. Petitioner agreed to cooperate with her counsel and to "[g]ive them a chance." Tr. at 15.

One week later, on June 7, 2014, Petitioner again wrote the court complaining that counsel seemed "more interested in me being insane than in[n]ocent" and stating that she was "guilty of not reporting a crime of self defen[s]e nothing more." Resp. Ex. 104 at 44. Petitioner declared, "I want a new lawyer or the ability to represent myself." *Id.*

On June 9, 2014, the court conducted another hearing after Petitioner's counsel moved for an evaluation of Petitioner's ability to aid and assist. Light explained:

> I just want to point out that recently Ms. Monica has attempted to contact people on the outside not affiliated with her defense attorneys to try and communicate with Your Honor and other people to try and, I think, circumvent the assistance of her attorneys…. A lot of her behaviors have directly contravened our efforts to either protect her, protect her from the media, protect her from public exposure

- 10 -  **OPINION AND ORDER**

and contamination of the jury pool, to work with her in order to effectively and efficiently conduct a defense investigation, to work with her in our efforts to obtain professional evaluations from her, and obtain records that pertain to her history and the case.

At every step of the way, she's been very resistant, distrustful. However, one of the things that's unusual is that she doesn't seem to think that it's inappropriate to do things that, I think, a rational person would not do, such as communicate on jail telephones—where it's clearly posted that those jail telephone calls are recorded—with outside people about things that she wants people on the outside to do that are in the nature of a defense investigation, without communicating those to counsel when she's been—when we've talked to her on multiple occasions about the proper procedure to work with us and get these things done in a way that is protected by attorney-client privilege and is therefore safe.

Tr. 21-22. Light also explained that Petitioner believed "she'll be acquitted if she's just given an opportunity to tell her side of the story." Tr. 21.

Upon questioning by the court, Petitioner stated that she understood the nature of the proceeding and explained:

The reason I refused the [attorney] visit was that I did not want this attorney as my attorney. That was why I sent you a "kite" and why I was in here last week to try to get another attorney. I have been trying to contact other attorneys and as yet, have been unsuccessful. I do not want to lie to this court. They have been asking me to go ahead and say that Steve Delicino was a bad person. They have asked me to go ahead and say that—

Tr. 23. The court interrupted and explained, "We're not going to get into what the substance of this case is here today," and that the court must determine "whether you are unable to aid and assist or you are unwilling to aid." Tr. 24. Petitioner admitted that she was "unwilling to assist" her attorneys and was simply "stating facts on the phone." Tr. 24-25. The trial court then explained why Petitioner's counsel was alarmed by her conduct:

The problem you're having with your, with a lot of what you're doing is you have an absolute constitutional right not to talk. Basically, not to say anything that may incriminate yourself. And whenever you talk to anybody, whenever you say anything to anybody on the phone or otherwise, the fear of your attorneys, and basically, you should—the fear you should have yourself, is that you're

- 11 -   **OPINION AND ORDER**

incriminating yourself somehow. So that's why your attorneys are asking you not to do this.

I do not believe that you are unable to aid and assist; I just believe you are unwilling to do that.

Tr. 25. Petitioner responded, "I am." Tr. 25. The court then informed Petitioner that it "can't keep giving you attorneys if your attorneys are going to basically be doing the same thing these attorneys are doing." Tr. at 25. Petitioner acknowledged the court's comments and admitted, "I know that, Your Honor. I've—I said it last week, I have been trying to get them to do things and finally, only last week, my private investigator has started doing something." Tr. 26.

The court eventually denied Petitioner's request for new counsel and encouraged her to cooperate with counsel and listen to their advice about talking to others from the jail. Tr. 29-30. Petitioner responded that she didn't "want to be lying in court," and said that counsel asked her to do that. Tr. 30-31. The court responded, "I don't believe that" and explained, "I can't just give you an attorney and an attorney and an attorney and an attorney at the state's expense. At some point, we've got to stop. Okay? So at this point, I am going to deny your request. We'll just keep this thing on track." Tr. 31.

On September 8, 2014, the trial court held a hearing regarding the trial date and Petitioner's dissatisfaction with the length of time until trial. During the hearing, Petitioner attempted to ask the prosecutor whether they had performed ballistics testing on two shotguns. Tr. 40. The court interrupted Petitioner and advised that she could not address the prosecution directly but must do so through her attorneys. Petitioner responded, "Well, my attorney, I tried to fire twice." Tr. 40. Petitioner complained about the delay in bringing her case to trial, and the court advised Petitioner that "with two murder charges pending against you, it is wise on your behalf to let your attorneys do their job" and explained why murder cases took longer to prepare

- 12 -   **OPINION AND ORDER**

for trial. Tr. 40-41. Petitioner then asserted that she was "not asking for an attorney at this late date" and was "willing to accept" their representation because she wanted a trial Tr. 43; *see also* Tr. 45. Petitioner and the court continued to discuss the trial date and the court commented, "I'm not going to go into particularly what type of forensics evidence [the prosecutors] have or what they don't have, because I don't really, quite frankly, want all that out in the public." Tr. 47. Petitioner responded, "I was trying to get this out in the public six months ago," and the court advised her, "No, you don't want that out in the public. You let the attorneys do their job. And then you'll have every right down the line; I guarantee you, every right, every opportunity to say whatever you want to say." Tr. 47.

Based on this record, the trial court did not unreasonably apply clearly established federal law when it denied Petitioner's request for new counsel. Petitioner's complaints boiled down to her disagreements with counsel about investigative tactics and strategy and counsel's efforts to constrain Petitioner from talking publicly about her case. "Disagreements over strategical or tactical decision do not rise to [the] level of a complete breakdown in communication." *Stenson*, 504 F.3d at 886. Further, Petitioner later conceded that counsel agreed to pursue her investigative queries, and, as the trial court emphasized, counsel was rightly concerned about Petitioner's efforts to publicize and "explain" her case through recorded phone calls from the county jail.

Petitioner nonetheless maintains that the trial court continually interrupted her and did not allow her a meaningful opportunity to explain the conflicts with counsel and that counsel took a position "adverse" to her. However, the record reflects the trial court's valid concern that Petitioner would implicate herself in open court, and the court gave Petitioner an adequate opportunity to describe her conflicts with counsel during the June 9 hearing. Further, the record does not reflect that counsel took an "adverse" stance against Petitioner; counsel merely

- 13 -   **OPINION AND ORDER**

explained that they did not understand the basis for Petitioner's requests and that they were working with her and trying to meet her demands, despite Petitioner's hostility and refusal to follow their advice.

Ultimately, the record does not suggest that Petitioner's counsel refused to communicate with her or failed keep her apprised of their efforts, and Petitioner fails to show a "complete breakdown" in communication or an "irreconcilable conflict" between Petitioner and counsel that effectively left her without representation. At most, the record reflects that Petitioner was an uncooperative and difficult client, and the trial court was not required to appoint new counsel in those circumstances.

Finally, even if the record supported an "irreconcilable" conflict or inadequate questioning to determine the depth of Petitioner's complaints, Petitioner cites no clearly established law of the Supreme Court holding "that an irreconcilable conflict with one's attorney constitutes a per se denial of the right to effective counsel." *Carter*, 946 at 508. This failure is "fatal" to Petitioner's claim, because § 2254(d) "conditions habeas relief on a determination that the state-court decision unreasonably applied 'clearly established Federal law' as pronounced by the U.S. Supreme Court." *Id.*

Accordingly, the trial court's denial of substitute counsel was not an unreasonable application of clearly established federal law.

### 2. Claims 3(a) and 3(b)

In Claim 3(a) and (b), Petitioner alleges that her trial counsel rendered ineffective assistance by failing to impeach the testimony of Jordan Farris, a witness called by the state, and by failing to challenge pawn shop receipts purporting to show that Petitioner pawned two shotguns to conceal the weapons from law enforcement.

- 14 -   **OPINION AND ORDER**

Under the well-established Supreme Court precedent of *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner alleging the ineffective assistance of counsel must show that "counsel's performance was deficient" and the "deficient performance prejudiced the defense." 466 U.S. at 687. To establish deficiency and prejudice, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. Unless a petitioner "makes both showings, it cannot be said that the conviction...resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Judicial review of an attorney's performance under *Strickland* is "highly deferential" and carries a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and, under the relevant circumstances, "might be considered sound trial strategy." *Id.* at 689 (citation omitted). Counsel must be afforded "wide latitude…in making tactical decisions" and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 689-90. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

A "doubly deferential" standard applies when "a federal court reviews a state court's *Strickland* determination." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). The state court "must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101; *see also Dunn v. Reeves*,

- 15 -   **OPINION AND ORDER**

594 U.S. 731, 739 (2021) (remarking that the *Strickland* "analysis is 'doubly deferential' when, as here, a state court has decided that counsel performed adequately").

a. <u>Failure to Impeach Witness Testimony</u>

Farris was detained at the Jackson County Jail at various times during Petitioner's pretrial detention. Tr. 1113. During Petitioner's trial, Farris contacted law enforcement authorities about statements Petitioner made regarding the deaths of Delicino and Haney, and the state called Farris as a witness.

Farris testified that Petitioner admitted shooting Delicino five times in self-defense after Delicino "attacked" her. Tr. 1113. Farris also testified that Petitioner said that she argued with Haney after she demanded that Haney leave her property, and when Haney did not leave, Petitioner shot him with a "shotgun" and left him in the pig pen for her pigs to eat. Tr. 1116. Farris testified that she decided to contact law enforcement authorities after receiving a birthday card on April 9, 2015, that Petitioner signed, "Happy B-day from the sweetest murderer in Jackson County, Susan Monica," because Farris was "creeped" out by the card and Petitioner's comments about Haney. Tr. 1114-15. Petitioner's counsel did not cross-examine Farris. On direct examination, Petitioner denied telling Farris that she and Haney argued or that she shot Haney with a shotgun. Tr. 1197-98.

Petitioner argues that counsel unreasonably failed to impeach Farris's testimony with evidence of Farris's prior criminal convictions and her potential bias arising from an interest in working with "MADGE," a Medford narcotics unit comprised of federal and state authorities. Pet'r Brief at 25-33; Resp't Ex. 121 at 52-53. During an interview with counsel's investigator, Farris described Petitioner's statements about Delicino's and Haney's deaths and confirmed that she was not "getting any time off for giving this information." Resp't Ex. 113 at 164-65; Resp't

- 16 -  **OPINION AND ORDER**

Ex. 123 at 30. Farris also told the investigator she had been contacted by MADGE and reportedly said "that she looked forward to working with the cops, as it would give her some money, and she would be able to keep away from selling meth." Resp't Ex. 113 at 165. In another memorandum, the investigator stated that she "definitely picked up that [Farris] was excited about the opportunity to work for MADGE. She definitely could have embellished the story that Susan told her. Not sure to what extent." Resp't Ex. 121 at 137. Petitioner argues that Farris's interest in working with MADGE warranted cross-examination about potential bias.

> The Oregon Court of Appeals rejected Petitioner's claim:
>
> [Petitioner's ineffective assistance claim arising from the failure to impeach] is a spurious claim, as Farris first testified to the jury that she had multiple felony convictions, and her testimony was that she was speaking with petitioner *while incarcerated*. Framing the issue as though the jury was unaware of the criminal background of the witness is disingenuous. Having heard the witness explain that she has multiple convictions, and that her testimony was based on her communications with petitioner while both were in jail, a reasonable attorney could conclude that no further cross examination about the witness's criminal record was warranted. Further, the bulk of the evidence against petitioner was her own statements to law enforcement in multiple recordings. There was little probability that this particular witness's testimony had the weight to tend to affect the outcome of the trial. The trial court was correct to conclude that trial counsel's decision was reasonable and not deficient, and, even if the performance was deficient, it did not tend to affect the outcome of the trial.

*Monica*, 319 Or. App. 384-85.

Petitioner argues that the Oregon Court of Appeals' decision is not entitled to deference because it did not address the issue of Farris's alleged bias. Petitioner further argues that the Oregon Court of Appeals unreasonably found no deficiency arising from counsel's failure to impeach Farris with her criminal history, because Farris had extensive criminal record, including felony convictions for burglary, possession of methamphetamine, and theft, a crime of dishonesty.

- 17 -   **OPINION AND ORDER**

During Petitioner's PCR proceeding, Pedemonte testified that he found Farris's interest in working with MADGE "too tenuous" to pursue on cross-examination, because Farris did not indicate that she actually worked with MADGE or that she received consideration or lenient treatment in exchange for testifying. Resp't Ex. 123 at 30-31; *see also* Resp't Ex. 121 at 53. Likewise, Pedemonte explained that "the State confronted [Farris's criminal history] during direct examination at least that she had multiple felony convictions on her record" and Pedemonte "felt that that undermined or took the wind out of our sails when it came to attempting to impeach her with that information." Resp't Ex. 123 at 28. Herbert agreed with Pedemonte's decision, because "the prosecutor handled all of that in her direct; that [Farris] sufficiently covered that she was—why she was in jail, and what her convictions were, so there wasn't really any reason for us to bring that back up, and as a trial tactic, I think it would have been not wise, so we left it alone." Resp't Ex. 121 at 52.

The record supports counsel's strategic decisions and the Oregon Court of Appeals' findings of no deficiency. On direct examination, Farris admitted that she had prior convictions and had been detained at the Jackson County Jail on several occasions. Tr. 1111-12, 1115-16. Farris further testified that she was not offered leniency or any promises in exchange for her testimony, and nothing in the investigator's report or elsewhere in the record suggests that the opportunity to work with a narcotics unit somehow influenced Farris's decision to contact law enforcement authorities or testify against Petitioner. Tr. 1116-17. Counsel thus reasonably concluded that Farris's perceived excitement "about the opportunity to work for MADGE" was "too tenuous" to show bias. Further, in light of the overwhelming evidence of Petitioner's guilt, the Oregon Court of appeals reasonably found no prejudice arising from counsel's decision. Accordingly, habeas relief is not warranted on this ground.

- 18 -  **OPINION AND ORDER**

        b.  Failure to Challenge Pawn Receipts

The state introduced the testimony of Sean Leimanis, who worked for Petitioner from July to mid-October of 2013, during the time that Haney worked for Petitioner. Tr. 1048. Leimanis testified that he had pawned two shotguns and Petitioner "was nice enough to pull them out of the pawnshop" in exchange for labor to repay the debt she incurred to reclaim the shotguns. Tr. 1052. Leimanis testified that after he performed enough work to pay off the debt, Petitioner did not return the shotguns and instead gave him new pawn receipts, explaining that she needed money and had to pawn Leimanis's shotguns. Tr. 1052-53. The state later introduced two pawn receipts showing that Petitioner pawned two shotguns on January 2 and January 6, 2014, the day she was contacted by law enforcement. Tr. 1119-1121.

In the middle of trial, Leimanis and his wife, Kathy Clawson, approached the defense investigator and said that Petitioner had pawned his shotguns in October 2013, not in January 2014. Resp't Ex. 138-39; *see also* Resp't Exs. 124-25.[2] Leimanis explained that in January 2014, he paid money to the pawn shop to avoid forfeiture of the shotguns, and he forged Petitioner's name on renewed pawn receipts because it was Petitioner "who brought them in." Resp't Ex. 121 at 139. Petitioner argues that counsel was deficient for failing to challenge the authenticity of the pawn receipts and rebut the inference that she pawned the shotguns in January 2014 to hide them from law enforcement.

> The Oregon Court of Appeals rejected this claim:
>
> [Petitioner's] argument [regarding the pawn shop receipts] is based on a false premise because the state did *not* proceed on a theory that petitioner used a shotgun to kill either of the victims. The post-conviction court correctly found that the state's theory during the jury trial was that petitioner used a rifle and a

---

[2] The investigator's report refers to October 2014 and January 2015, but Clawson's and Leimanis's declarations and the evidence of record establish that the events occurred in October 2013 and January 2014. *Compare* Resp't Ex. 121 at 139 *with* Resp't Exs. 124-25.

- 19 -  **OPINION AND ORDER**

pistol to kill the victims, referring to petitioner's own admissions and varying stories to corroborate the theory. The state did refer to the use of shotguns to kill one victim during closing argument, but it was in the context of sifting through the various versions of events that petitioner had provided to police, and the main thrust of the reference was the improbability of petitioner's stories. Further, petitioner's opening statement conceded that she shot the two victims and challenged only whether she had caused their deaths. Thus, trial counsel was not deficient for failing to investigate the receipts because the state was not employing a theory that would make such an investigation fruitful for petitioner's chosen defense. The post-conviction court did not err when it rejected that claim.

*Monica*, 319 Or. App. 385. Petitioner argues that the Oregon Court of Appeals unreasonably found that the state did not rely on the shotgun when presenting its case against Petitioner and that reasonable counsel would have challenged the forged pawn receipts by eliciting testimony from Leimanis or Clawson. Pet'r Brief at 35, 38.

One of Petitioner's defense theories was that Haney left Petitioner's property in September 2013 to look for the perpetrator who had raped his daughter and that someone related to the assault could have harmed Haney. Resp't Ex. 121 at 55-56. On cross-examination, Leimanis testified that Haney said his daughter had been raped, and that Haney was very angry and wanted to find the perpetrator. Tr. 1053-54. Because Leimanis's testimony supported Petitioner's theory, counsel did not want to risk opening the door to impeach his testimony by calling Leimanis back to the stand to admit that he had lied and forged Petitioner's name on the pawn slips. Resp't Ex. 121 at 55-56.[3] Counsel also believed, "It didn't make any difference what gun [Haney] was shot with, given that [Petitioner] testified and told us all along she shot him with a .22, and I expected her to say that on the stand." Resp't Ex. 121 at 49; *see also* Resp't Ex. 123 at 33-34. At trial, a medical examiner testified that Delicino's wounds were consistent with a

---

[3] Counsel also might have decided against calling Leimanis or Clawson to testify about the pawn receipts because Clawson told the defense investigator "that Susan and Haney had a 'huge fight' the day before he left." Resp't Ex. 121 at 138.

**OPINION AND ORDER**

.22 caliber rifle or pistol and Petitioner testified that she shot Delicino and Haney with a rifle. Tr. 1134, 1139-40, 1195-96.

Further, counsel did attempt to rebut the state's implication that Petitioner pawned the shotguns in January 2014. Counsel reexamined the detective about the signatures on the January 2014 pawn receipts to show that they did not match Petitioner's signature. Tr. 1155-56. Further, Petitioner testified that the signature on the pawns receipts was not hers and that she did not pawn the shotguns in January 2014. Tr. 1198-99. Had counsel pursued this line of investigation further, the jury likely would have learned that Petitioner pawned the shotguns in October 2013, shortly after Haney's disappearance, which would have supported a similar inference of guilt as pawning them in January 2014 did. *See* Ex. 121 at 139 (counsel stating that evidence showing that Petitioner had pawned the shotguns in October 2013 "would not help [petitioner], but actually hurt her").

Given the deference owed to counsel's decisions and the marginal relevance of the pawn receipts, the Oregon Court of Appeals reasonably found no deficiency or resulting prejudice arising from counsel's failure to pursue further investigation of the pawn receipts.

B. Procedural Default – Claims 2(b) and 4

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks and citation omitted). In order to exhaust state remedies, a petitioner must present all federal constitutional claims to the State's highest court before seeking federal habeas relief. *Id.*; *Cooper v. Neven*, 641 F.3d 322, 326 (9th Cir. 2011) ("Exhaustion requires the petitioner to 'fairly present' his claims to the highest court of the state.").

- 21 - **OPINION AND ORDER**

If a claim was not fairly presented to the state courts and no state remedies remain available for the petitioner to do so, the claim is barred from federal review through procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 732, 735 n.1 (1991); *Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002) ("A procedural default may be *caused* by a failure to exhaust federal claims in state court."). A federal court may consider unexhausted and procedurally barred claims only if the petitioner demonstrates cause for the default and actual prejudice, or if the lack of federal review would result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451(2000); *Coleman*, 501 U.S. at 750. Cause "must be something *external* to the petitioner" that impeded efforts to comply with the state's procedural rules, *Coleman*, 501 U.S. at 753, and prejudice is "actual harm resulting from the alleged constitutional violation." *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1991); *see also Coleman*, 501 U.S. at 750. A fundamental miscarriage of justice requires a showing that the petitioner was actually innocent of the underlying crime. *Schlup v. Delo*, 513 U.S 298, 327 (1995).

1. Claim 2(b)

In Claim 2(b), Petitioner alleges that the trial court violated her Sixth Amendment right to self-representation by "interfering" with Petitioner's ability to represent herself at trial. Petitioner concedes that Claim 2(b) is unexhausted because she failed to raise this claim before the Oregon courts on direct appeal. Petitioner nevertheless argues that this Court may review Claim 2(b) under the miscarriage of justice exception to procedural default.

To make a gateway showing of actual innocence, Petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial" and that establishes "it is more likely

than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S at 324, 327.

To support her claim, Petitioner submits a declaration asserting that Delicino beat her "with the butt of a rifle so hard and so often" that she killed him in self-defense. Pet'r Decl. at 2 (ECF No. 49). This is not "new" evidence. Petitioner testified at trial that she shot Delicino in self-defense, and this evidence was known to Petitioner at that time. Accordingly, Petitioner does not establish actual innocence to excuse the default of Claim 2(b).

### 2.  Claim 4

In Claim 4, Petitioner alleges that her Sixth Amendment right to counsel was violated when Herbert failed to disclose a conflict of interest arising from her representation of Farris in 2014. Petitioner contends that this conflict adversely affected Herbert's representation and prevented counsel from impeaching Farris and that prejudice must be presumed under *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

Petitioner did not raise Claim 4 during her PCR proceeding, and she concedes that this claim is unexhausted and procedurally defaulted. Petitioner nonetheless argues that Herbert's failure to disclose the conflict of interest establishes cause for the default, because Petitioner had no way of knowing that Herbert represented Farris. Alternatively, Petitioner argues that PCR counsel's failure to raise this claim provides cause to excuse the default. *See Martinez v. Ryan*, 566 U.S. 1, 11 (2012) ("Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."). Even if Petitioner is able to establish cause on these grounds, she fails to show prejudice.

Herbert apparently represented Farris from February 2014 until July 14, 2014, when Farris pled guilty to possession of methamphetamine and was sentenced to probation and time

- 23 -  **OPINION AND ORDER**

served. Resp't Ex. 113 at 173-75. The record reflects that Farris did not contact law enforcement authorities about Petitioner's statements and was not identified as a state witness until April 2015, many months after Herbert's representation of Farris ended. Tr. 1114. Thus, to the extent a conflict existed, it arose from Herbert's successive representation of Farris and Petitioner.

Under *Sullivan*, prejudice is presumed when counsel's representation is burdened by an "actual conflict of interest." 446 U.S. 348-49. A petitioner must show that counsel "actively represented conflicting interests," *id.* at 350 and "demonstrate that an actual conflict of interest adversely affected" counsel's performance. *Id.* at 348. However, the rule in *Sullivan* addressed the inherent prejudice arising from counsel's concurrent representation of clients with adverse interests, and no binding authority holds that *Sullivan* applies to successive representation. *See Noguera v. Davis*, 5 F.4th 1020, 1035-36 (9th Cir. 2021) (explaining that "there is no clearly established law that *successive* representation constitutes an 'actual conflict' that we would assess under the *Sullivan* standard"); *see also Mickens v. Taylor*, 535 U.S. 162, 175 (2002) (stating that "the language of *Sullivan* itself does not clearly establish, or indeed even support," the application of *Sullivan* to successive representation); *Rowland v. Chappell*, 876 F.3d 1174, 1192 (9th Cir. 2017) (explaining that "the Supreme Court explicitly limited this presumption of prejudice for an actual conflict of interest (also known as the '*Sullivan* exception') to cases involving 'concurrent representation.'"). Accordingly, *Sullivan* does not apply to Claim 4 and prejudice is not presumed.

Where prejudice is not presumed, a claim challenging counsel's performance "can be resolved under *Strickland*'s familiar performance-and-prejudice framework." *United States v. Walter-Eze*, 869 F.3d 891, 906 (9th Cir. 2017). Here, it was Pedemonte, and not Herbert, who was tasked with the cross-examination of Farris. Resp't Ex. 121 at 48; Resp't Ex.123 at 24.

- 24 -   **OPINION AND ORDER**

Pedemonte decided against cross-examining Farris because she admitted her criminal history on direct examination and testified that she received no benefit or promise of leniency in exchange for her testimony. Resp't Ex. 123 at 28-30. Although Herbert agreed with Pedemonte's decision, no evidence of record suggests that Herbert's previous representation of Farris affected Pedemonte's trial strategy. Resp't Ex. 121 at 51.

Finally, the Oregon Court of Appeals reasonably found no deficiency of performance or prejudice arising from counsel's decision to forgo cross-examination of Farris, in light of the deference owed to counsel's strategic choices and the overwhelming evidence of guilt presented against Petitioner. Accordingly, Petitioner fails to show that Herbert's previous representation of Farris establishes prejudice to excuse the default of Claim 4.

### **CONCLUSION**

The Second Amended Petition for Writ of Habeas Corpus (ECF No. 25) is DENIED and this action is DISMISSED. A Certificate of Appealability is DENIED on the basis that Petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). IT IS SO ORDERED.

DATED this  25th  day of March, 2026.

_____
/s/Ann Aiken
ANN AIKEN
United States District Judge

- 25 -   **OPINION AND ORDER**